I'm sure I mispronounced that. And Mr. Arthurs, the counsel for the appellant. When you're ready, Mr. Arthurs. Yes, Judge. Good to have you with us, sir.  I'm Jonathan Arthur. I represent the appellant in this matter, Caron Nazario. May it please this court, at the heart of this appeal is a question about a traffic stop gone horribly wrong. And where I'm going to focus is whether the district court erred in its motion for summary judgment in determining that the appellees had probable cause for three crimes. Eluding, obstruction of justice, and failure to obey. And this is important because this probable cause analysis factored into the court's qualified immunity analysis. The evidence that was presentable, the arguments that could be made, as well as the jury instructions. Now, I'm aware in this court, I know is aware this is a fact specific, fact intensive determination. But as my esteemed colleagues have pointed out, because this is all on video, there's no factual, no factual issues. So the standard is de novo. Did the district court appropriately apply the elements of the offense and the law of probable cause to the facts? So before I begin, does this court have any questions? Yeah, what is your best case law supporting a clearly established right to be free from force that includes the things that happened here? The threats and the aiming of firearms and the pepper spray? So I think, Your Honor, that would be Armstrong versus the village of Pinehurst, if I believe. This court said that for all excessive force claims, we are going to be looking at them through the lens of the Graham factors, particularly the first three, right? What was the crime judged by the actions and not the title of the offense? What was the, well, did the plaintiff, did the appellant, was he acting, was he a danger to the officers or to the other, anybody else? And was he actively trying to resist? So I think it's axiomatic that we can expect our government officials to know if X is wrong than Y is. Are you saying they shouldn't have stopped him at all? No, Your Honor. You're complaining about what happened after the stop. That's exactly correct. You concede there was reasonable sufficient to stop him? Yes, Your Honor, he did not. To stop him for what? He did not have. They said eluding, you're not conceding there's reasonable, there was probable cause to stop him for eluding, are you? No, Judge Thacker, I'm not. They had probable, his license plate was not displayed in the appropriate location. Right, okay. So the eluding. So you're conceding that the license plate was displayed illegally? Yes. That they had a reason to stop? They had a reason to stop him, yes. The license plate was on the rear of the vehicle. Rear upper right-hand corner behind tinted glass. Well, the statute says it has to be on the front or the rear. And I believe the statute also dictates that it can't be behind tinted glass. Who put it on there? That was a car dealer. Yes, Judge. But you're conceding that point, that there was a legitimate stop? Yes, Judge, I'm conceding that the officers. For that? Just for the traffic, just for the license plate. And that's a traffic violation? Is that a misdemeanor? That is not even a misdemeanor, Judge Thacker. Okay. That can be prepaid, so it's technically a traffic offense, but it is something that I believe that the officers could have detained him for to investigate. The issue is what happened after that. And so with the eluding, just moving directly into the eluding statute, the eluding requires a willful and wanton. There's two mens rea elements there, willful and wanton, which incorporates these ideas of just cause, continue to driving, continue driving in such a way that was indifferent to the danger that it created for the safety of others or attempting to flee after having received a signal to pull over. I thought Virginia distinguished between misdemeanor and felony eluding, and felony eluding is a danger to yourself or others, but misdemeanor is just eluding the signal. I believe, if I understand the eluding statute correctly, felony is when you have created a danger. Misdemeanor is whether you are kind of indifferent to whether you are creating one or not. You're reading that into the word wanton, for wanton disregard of a blue signal. Yes, Judge, and I think that's consistent with the Bazemore case, and I understand that Bazemore was a sufficiency of the evidence, but the Virginia Supreme Court took a look at willful and wanton, which is in 46.2817A, and parsed it out using its case law as well as Black's Law Dictionary. Even if they didn't have probable cause to think he was eluding, do you think when the car finally came to a stop, did the officers have, they claimed that they had some sort of suspicion that he was up to something. He drove slowly for over a mile before he stopped, and they said, you know, in our experience that suggests someone might be preparing to flee or trying to hide a gun or drugs or something, and so they were on alert. And for the sake of argument, I will see that as reasonable. Whether I agree with it or not, I don't think it's – The reason I ask is because the question of probable cause, it matters for each moment that the officers took action. Yes, Judge. And your brief kind of argues about the whole incident, but we have to look at, okay, at the moment they stop the car, they get out and pull their guns. Yes, Judge. Did they have – was that reasonable? And then at the moment that they spray the pepper spray, was that reasonable? You know, we have to look at each moment. Correct. So if you agree that they had reason to be on alert when they stopped him, thinking that he was up to some sort of criminal activity in the over a mile that he drove after they turned on the lights, we have to assess were they justified then in conducting what they called a felony stop? Correct. And I think to answer that question directly, no, they were not justified because, as they have said multiple times on video, waiting to pull over to a well-lighted space, a well-lit space for officer safety and for the safety of everyone else is reasonable. It happens all the time. It happened to – which is kind of an objective statement of what law enforcement experience. It happened to one of these officers a lot, and that 80% of the time it was a minority. So you're saying they could never have justification to pull their arms after someone's perhaps eluded them for over a mile because it's often justified. But in this case, it was not justified. I'm not going to say never. How did they know that? They don't see inside the car. They don't see who's driving. They're just behind him for, you know, 1.1 miles. And I think that's consistent. We have to look from an officer's perspective. So from the perspective of a reasonable, objective officer here, why? Maybe they had Terry. What's that? Maybe they had some kind of Terry reasonable, articulable suspicion. But what we're looking at now, I think, is probable cause, which is a higher standard. And I think that's – if that answers the court's question where the difference lies. They had probable cause for eluding? Yes, Judge, probable cause for eluding. We didn't approach – I understand that the force was – They had reasonable suspicion because of the license plate, but they needed probable cause for eluding to pull the gun out when they stopped him. Yes, Judge King. And why didn't they have probable cause for eluding? Why did they not? Yeah. They did not because when you take in what the officers saw between the time that Officer Crocker initiated his lights and the time that Lieutenant Nazario stopped, when you take a look at those facts on this video, they had seen no crime. They had seen a minor traffic violation and that's it. They knew the speed limit was 35. They knew in the video demonstration, the radio traffic shows, that Lieutenant Nazario immediately slowed to 22 and then to 18. Both of the officers knew this because one was relaying it to dispatch and the other was listening. It was a mile. It was a minute and 40 seconds. Lieutenant Nazario used his blinker, turned into a very well-lit BP gas station, turned his car off. So he obeyed traffic laws. What if he drove for 10 miles at a slow speed, obeying traffic laws? Would that become eluding? That would be much closer to eluding, I believe, yes. What about five? That might create a reasonable, articulable suspicion for eluding, but I still don't think. You could have us tell the officers they don't have probable cause for eluding at five miles, but they do somewhere between five and ten. Are we supposed to be drawing those lines? I don't think we have to draw those lines for this particular case. I just think for this particular case that. But that seems to be what everything hinges on. You're saying it hinges on the amount of time and the distance. The amount of time, yes, Judge. The distance and then what these facts known and knowable, right? This is a reasonable thing. This happens all the time. Maybe it's eluding. Maybe it's innocuous behavior, which I think Wingate versus Fulford, if I remember correctly, touches on. This is something that commonly occurs, which weighs. Maybe it helps with a Terry-style determination, but I don't think it gets anybody to probable cause. Whether a reasonable and prudent officer would think it's more likely than not that over this one mile and change, this minute and 40 seconds, Lieutenant Nazaria was attempting to flee. And I think that's the issue. Maybe it was a reasonable, articulable suspicion. But it is not probable cause. And it's definitely not sufficient to pull a felony stop because, as the officer admitted, he had not seen a felony up until that point. So the moment they step out, maybe that was a non-contact excessive force. We didn't argue that. But it just was not appropriate. And that triggered in the lieutenant his ability to – it started triggering in the lieutenant his legal ability to resist using the minimum amount of force necessary. Can I ask about – you just said something about you didn't argue something. What are you arguing was the excessive force here? The excessive force, Judge, would be the O.C. spray, would be grabbing Lieutenant Nazaria and knee-striking him, knowing he was incapacitated after being sprayed by the O.C. spray, throwing him on the ground and placing him in handcuffs. So you're not arguing that drawing their weapons was an excessive use of force? Not in this – no, Your Honor, I'm not. I have a practical question. If we were to reverse on the finding that there was probable cause on eluding but affirm on the excessive force and the other things, what would you have us to do? If I understand the Court's question, Judge Sackard, reverse on the probable cause but affirm on the qualified immunity analysis, I still think that we would need to reverse. And that's simply because – Reverse the whole thing and send the whole thing back. Minus the findings against Officer Crocker on the illegal search. And do what? Send it back for another trial? It would need to be a new trial because that probable cause determination shows up in the jury instructions, jury instruction 26 and 27A. Where does the death threat come in? You haven't mentioned those. We haven't gotten there. The death threats – You haven't gotten there? Why haven't you gotten there? So the death threats. Death threats, you know, they're saying – we have this argument that Lieutenant Nazari refused to comply with all these commands to get out of the vehicle, but when you watch the video, he's got his hands out, he's calm, and he's saying, what's going on? And we get a death threat. And then we get confirmation subsequently that he should be afraid to get out of the vehicle. No reasonable officer behaves like that. And that triggers a Lieutenant Nazari with his legal right to, A, resist, and, B, they put this man in this lethal catch-22. What do I do? Do I keep my hands out? Do they disappear? What happens if they disappear? Am I going to get shot? So the fact that he resisted, if you will, using the least amount of force possible, i.e. staying put, A, is his right under law, and, B, I think that facts into the obstruction analysis. Because no reasonable officer says, get out of the car, oh, by the way, you should be terrified to do that. That's why some of the case law that the district court relied on just didn't quite work, is under no circumstances were the facts such that the officer – At what point here did they recognize that he was in an Army uniform and was an Army officer? Yes, Judge. What was the question? At what point did the officers know that he was a military officer in uniform? At what point did they know or did they see? I think they saw he was in uniform at the beginning of the traffic stop. I think they knew when he produced his ID card after they had O.C. sprayed him. And that's my understanding of the facts, but even if he was – They know that at the time they made the death threat. And he was in an Army uniform. That's what I'm asking you. Yes. I think Officer Gutierrez's body-worn camera clearly shows that he could see directly into that vehicle that Lieutenant Nazario was in uniform. Does that answer the court's question? And just to clarify, the death threat is the officer who said, you're fixing to ride the lightning, son, with the taser? Yes, Judge. You're fixing to ride the lightning. Which even that officer admitted he had heard is a dual-use O.C. spray as well as a means of state-sponsored execution. It's really confusing, right? No one who doesn't use a taser all the time knows what ride the lightning means. Yes, Judge. So does the court have – I'm past my time. I'm going to rest on the remaining brief or save the rest for rebuttal. As long as you get questions, you answer them. Yes, Judge. You understand that? I'm happy for a hot man. I refer to them as death threats because that's what you all refer – you refer them to. Are we entitled to characterize them as death threats in the context of this case? I believe that would be appropriate, Judge, yes. I mean, it's a – while it may have two different meanings, law enforcement may use it colloquially, tongue-in-cheek, to tase somebody, the fact remains that in the broader sense, that connotes a death threat. It connotes being executed by the state via electric chair. And when you're facing down two firearms – Was it made in the context of trying to get him to get out of the car? Judge, if I remember correctly, the facts on the video will show it was made in the context when Lieutenant Nazari was pleading with the officers to tell him why they had their firearms drawn and what was going on, and that was the first – he asked a series of times, please tell me what's going on. And the first thing that the officers said – He had the firearm pointed at him when he said, you're going to ride the lightning? Officer Crocker did, Judge. Officer Gutierrez, I believe by that point in time, was either transitioning to or had transitioned to a taser which was not bright yellow. It remained dark. It looked like a pistol. They both had their weapons trained on him and told him he was fixing to ride the lightning. And that's what the videos show. Okay. Anything else? You've saved some time. I'm going to reserve the rest, Judge. Thank you. Ms. Lauren? Thank you. May it please the Court and Larren. Good to have you with us. Go ahead. Thank you. May it please the Court and Larren, on behalf of Officer Crocker and Jessica Swager on behalf of Officer Gutierrez. As Mr. Nazario's counsel has conceded, the officers had reasonable suspicion to initiate the traffic stop. This was a new model Chevy Tahoe with heavily tinted windows without a properly displayed license tag. And that furthermore, after the lights and sirens were initiated, activated by the officers, Mr. Nazario continued to drive for 1.1 miles and a minute and 45 seconds. He drove slowly. He did slow down. And it was after dark. It was at 6.30 p.m. on a Saturday night through downtown Windsor. Was it dark? It was dark, but this stretch of road, it's important to consider the context. This was through downtown Windsor. And there was a demonstrative video that was submitted with the motions for summary judgment that the District Court reviewed. On the right side of the road during the time when Mr. Nazario continued to drive, he passed two banks, an Italian restaurant, a strip mall, a fire station, a CVS, and City Hall, all on the right side of the road while giving no indication that he was going to comply with the officer's request. This was too marked. At some point he turned his blinker on, though, when he turned into the well-lit gas station, or before he turned into the well-lit gas station, and taking the facts in the light most favorable to appellant, he said he was not familiar with the area. And, Your Honor, that is, we do have to take that fact in the light most favorable to the appellant because the officers disputed that any turn signal was used and with the angles. On the summary judgment, we take all of them in favorable. Yes. Most light, most favorable to the appellant. Correct. All of them. Not in the light most favorable to you. Yes, Your Honor, that's correct. You have to concede that. He conceded on the reasonable suspicion. You have to concede on the fact. The light most favorable to the appellant. At that point, Mr. Nazario had driven for approximately one mile. For a minute and 40 seconds. Correct. Before then, 18 miles an hour. Slowly. Which now they say that's some sort of, right, you're alluding at 18 miles an hour. Now that's some sort of problem. In the time I've been on the court, I have heard law enforcement say that going slow is suspicious. Going fast is suspicious. He looked directly at me. That's suspicious. He looked away. That's suspicious. It's not adding up for me on the alluding. Well, Your Honor, if we, speed and reckless behavior is not necessary for the purposes of alluding. We can go back to the infamous O.J. Simpson alluding where he went slow. What was the basis of the felony stop? It was the high risk, the suspicious behavior of the driver. Of going slowly? Yes, Your Honor. Passing multiple places on the right side of the road that were well lit where he could have pulled over. Notably, the BP gas station where he ultimately pulled over. At that point, you need more than reasonable suspicion. You need probable cause. Correct. And, Your Honor, in the case law. And the judge said you had probable cause? Correct. Probable cause. He said, and your colleague here on the other side says that's erroneous. And that's the ground for the appeal. Part of it. Part of the grounds for the appeal is what Mr. Arthur has argued, that there was no probable cause. However, there's two prongs, and this goes under whether or not they had probable cause for alluding. But I believe we also need to look at the qualified immunity analysis and look at the case law. As cited by the district court, the Manners v. Cannella case in a different district found that there was probable cause for alluding when a driver drove three blocks over 14.4 seconds and about approximately one-tenth of a mile. In the Kowalski v. Geese case from the Eastern District of Wisconsin, also cited by Judge Young on his order granting summary judgment. And where was the first one from? I believe that is Florida. Okay. So neither of those have any precedent here. Correct. Do you have any for precedent in our court? Not specifically on the different times for the alluding, but it is, when you look at the context of- What does alluding mean in a dictionary? To evade, to avoid, and in this case, by passing multiple locations to where he could have stopped, it was clear or reasonable for Officer Crocker to believe that Mr. Desario was alluding. Furthermore, in the case law, as Judge Rushing has pointed out, there is a two-prong analysis. There's a misdemeanor alluding and there's the felony alluding. The misdemeanor does not require the willful- Dictionary definition doesn't apply. It's a Virginia statute definition. Is that what you're relying on? Well, we- No. You're not relying on what you're relying on for a definition of alluding. Well, alluding- I think of one of my grandchildren running from me. Well, right. But there is no- Well, if there was a requirement that the driver go at an excessive rate of speed, that would be included in the statute, and it is not. And so, this case- He slowed down when they turned on the siren. Yes. From 35 to 22, and then he said 18, and then he's going 18 miles an hour through downtown Windsor, and turned left into the BP station, I think he said. Yes. That's a big parking area there or something. And he stopped. And that's where all this happened, right? Yes. And you're saying he violated Virginia's alluding statute, whatever it is. Yes, Your Honor. And I would also say that whether or not there was probable cause for alluding, it still does not matter as the traffic stop unfolds. Because as counsel has conceded, the manner- And you say there was a violation of the obstruction statute? Correct. A violation of failure to obey statute? Yes. And, Your Honor, we believe that is established by the U.S. Supreme Court. When there is a- The obstruction was, what, failure to get out of the car? That's part of the obstruction, yes. And that is- It's hard to get out of a vehicle when you're also told to keep your hands out of the window, but also get out of the vehicle when you have your seatbelt on. I don't know how any of that- It's impossible to do both. Well, Your Honor, a couple things that- Is that correct? You concede that, he conceded that. I don't. Actually, he could have- You don't concede. He could have gotten out of the car even though he had his hands out of the car. If Mr. Nazario had not then locked the door to his vehicle, he could have opened it from the outside. Furthermore, in watching the video, the conflicting instructions that- So just to clarify, when you say he could have opened it from the outside- The driver, Mr. Nazario. The officer tried to open it. The officer did. And Mr. Nazario locked it with his elbow. Correct. In the video, it shows that after the stop, that the officer, Officer Crocker unlocks the vehicle, opens the door partially, and then Mr. Nazario shuts it with his elbow and holds down the lock, which is under where his left arm is. Back to the sort of practical question I asked opposing counsel, if we were to find there was not probable cause for the eluding, can we still affirm the district court on the qualified immunity? Yes, Your Honor. As counsel has conceded, there was reasonable suspicion for the traffic stop. He also, counsel also conceded- Correct. Then, under Pennsylvania v. Mims, nearly 60 years ago, the U.S. Supreme Court found that when there is a legitimate, a lawful traffic stop, the officers may order the driver to exit the vehicle. This court has- At gunpoint. Counsel has conceded that the drawing of the firearms was not unreasonable. So is there case law that says that's okay for something that's less than a misdemeanor? Well, I believe so. And that qualified immunity, even if it was determined that this may not, that there may not be probable cause for eluding, in this case, the suspicious behavior and in the interest of officer safety, which is paramount at all of these cases, especially in Pennsylvania v. Mims, in allowing the officers to order a driver out of the vehicle, that that is going to be reasonable and all the driver has to do is comply. Furthermore, in this case, we have the first-person vantage point of Mr. Nazario, where you can see he is not afraid. You can hear Officer Crocker's clear commands on Mr. Nazario's own video. At that point, when Mr. Nazario refused to get out of the car, that in itself creates probable cause for obstruction. In the Coffey v. Morris case, there was a traffic stop where a driver refused- In the failure to obey, how do these law enforcement officers fit within the statute? Well, we believe that the failure to obey is essentially a lesser included offense of the obstruction and that when the officers give a lawful order that someone refuses, that that falls under the failure to obey. Notably, that is a Class II misdemeanor, obstruction of justice is a Class I. Even when you give conflicting orders? Well, Your Honor, the conflicting commands, we disagree that they were conflicting, but assuming for purposes of this argument that they were, those did not start until after- So the question is reasonable, and we look at it in the light most favorable to him. Correct. You and I agreed with that. Yes. Agreed on that. And they're conflicting orders. In the light most favorable to him, they absolutely are conflicting orders. Well, I think, Your Honor, when you look at the time frame- He's showing his hands. You tell him to get out of the car. And, Your Honor, when you look at the time frame, it's not- And you say he disobeyed orders because he didn't get out of the car. Well, and, Your Honor, I think it's important to note that Officer Gutierrez does not speak until after Mr. Nazario says flatly, I'm not getting out of the vehicle. That is when, up to that point, it has only been Officer Crocker issuing commands. And then after- Now, is that the failure to obey? When you say- The failure to obey broadly fits in with the refusals- But the law enforcement officers don't fit within the failure to obey statute, according to this Tacora, Virginia case and the statute itself. I don't see law enforcement officers listed in this long list of conservators of the peace that this statute covers. Then, Your Honor, if that were to be the case, we believe that there- Have you seen the statute? Maybe you can point to me where it says law enforcement officers. I will not say I am not familiar or not ready to take that question, but we would argue that that would not be dispositive as to the analysis, as it is very clear the officers had probable cause for obstruction. What's the number of the statutory number? Maybe I'm looking at the wrong thing. That is 18.2464, failure to obey. Okay. And I'm surprised you haven't looked at it. I have. Okay, then where? Where does it say law enforcement officers? You said you weren't prepared to answer that question. Well, if you listed a long list, in this case it says a conservator of the peace. I think we could believe that that would- But it has an exhaustive list of what a conservator of the peace is, and it doesn't include law enforcement officers. And that Virginia appeals court says law enforcement officers are not listed as conservators of the peace in the statute, so that the defendant there could not be found guilty of the statute. That's a Virginia appellate court case construing their own statute. Is that not in the brief somewhere? We have the code section, which does not list out who conservators of the peace are. Do you know that case I'm talking about? Maybe that's the challenge. I do not, Your Honor. Okay. But we would still maintain that with probable cause for obstruction, which is clear, that the failure to obey would not be dispositive in the outcome. And so at most, that would be harmless error if error at all. I'd like to address the allegations- What's harmless error? How does that get into your- If, as Judge Thacker had said, if the court were to decide- Well- I don't know what you're talking about. Well, when you're looking at the- Let me ask you. I want to find out about- You agree that early on in this, they knew that he was a United States Army officer. No, Your Honor. A missioned officer. He was in uniform. Let me finish. And he received death threats. You're going to ride the lightning from the defendants here. Look at that in the light most favorable to the plaintiff. Well, I don't believe- Now, how do you handle that? I don't believe we need to look at that in the light most favorable to the- To a military officer in this vehicle. Well, first of all, they're not death threats. This is a colloquial term for use of a taser. I didn't know that's what ride the lightning meant. I thought it was a reference to the electric chair. Well, and even if that were the case, the electric chair has- Most favorable to him. I don't believe we need to for that purpose, Your Honor. This comes down to a qualified immunity analysis, which is the perspective of a reasonable officer. When it comes to at the point where that statement is made, that should be viewed, the comment by Officer Gutierrez, first of all, the electric chair has not been in use in Virginia since 2013, and therefore any belief that an officer was going to- Well, we've never had it in West Virginia, and I still thought that's what it meant. Well, at that point, when you look at the use of force, the officers- Especially with firearms having been drawn already. With the officers, when they initiate the stop, with their firearms drawn, and then Mr. Nazario refuses some 40 commands to get out of the vehicle and show his hands, at that point it is clear that obstruction of justice has been established, at least a probable cause. As far as whether the officers knew that Mr. Nazario was an Army officer, the initial part, he puts an elbow in view, which shows camouflage. But this was December 5th, in the middle of- What?  Camouflage. Camouflage. Camouflage. But this is Windsor, Virginia, December 5th, in the middle of hunting season. You'll see at the end of Officer Gutierrez's body camera video that the supervisor chief of police shows up wearing camouflage overalls on his night off, where he showed up at the request of Mr. Nazario. Further, if I may, a final comment with regard to the comments made by Officer Gutierrez. At that point, Mr. Nazario has already stated he is not getting out of the vehicle. At that point, the officers have already tried to get him out of the vehicle with the show of force. He said he was fearful because he was black and they were white. I don't believe he stated that anywhere in any of the briefs. That's what he said. That's in his record. I don't believe he made it- I don't know if he said it that night, except one of your clients said it to him. He understood why he didn't stop. Afterwards, while they're trying to- In the circumstances. He understood, in the circumstances, why he didn't stop, because he was a minority. Why he waited until they got to the BP station. We disagree. Furthermore, that would have been Officer Gutierrez and Officer- You disagree that that was said after the fact? After the fact, when the officers are trying to calm down a previously combative and uncooperative driver, the officers will say things to calm someone down to gain control of the scene. At that point, all of the actions had already taken place. And again, this summary judgment goes on the qualified immunity for the officers and what a reasonable officer would have believed. It is an objective analysis and is not dependent on the subjective viewings of the individual officers. Furthermore, it was Officer Crocker who initiated the high-risk stop and Officer Gutierrez afterwards who made those comments. We would simply argue those are irrelevant to the question of law at hand. Officer Gutierrez made the statements and they're not attributable to the state or to Officer Crocker. Is that your point? No, the point is that the statements made after the fact do not override any probable cause that existed for or the reasonable suspicion for the stop. The probable cause to believe that Mr. Nazario was eluding. The probable cause to believe he was obstructing. That incident is over by the time the statements have occurred. And this is simply an effort to calm down an uncooperative driver whom they are considering releasing back to the vehicle. And furthermore, that, while not specifically raised on appeal, is why we believe that the Officer Crocker unloading the firearm, which was in the driver's compartment of the vehicle and replacing it, did not constitute a search and was merely within the reasonable bounds for an officer to protect for their own safety. Thank you very much. Thank you. We appreciate it. Mr. Arthur? Yes, Judge King. So turning back to the eluding, the misdemeanor eluding is 46-1817A. It has baked into it the willful and wanton standard, making it a Class II misdemeanor. 46-1817B. Can I ask you about Judge Thacker's question about the eluding? Because I guess I was under the misimpression that you thought there was some sort of excessive force tied to the response. I missed Ms. Weiger. Oh, I'm so sorry, Judge. It was my fault. I apologize. Of course. I apologize. I really do. Of course. I'm sorry. It was right here in front of me. I'm Jessica Swager. Judge Thacker, straighten me out. Of course. I'm Jessica Swager. It may please the Court. On behalf of Joe Gutierrez, Ms. Lahren, I think, covered everything. We adopt her arguments. And if the Court has any questions for me, I think she took up our full 20 minutes, but I'm happy to answer any questions the Court may have. No, but you have time. You reserve some time. Five minutes. And you can use it if you want, as much of it as you want. I will be happy to take a seat, Your Honor, and we rest on our papers in the arguments we've already presented. Any questions? No. Thank you, Your Honor. Thank you very much. All right, Ms. Lahren. Yes, Judge. So, I wanted to return to the question about if, hypothetically, if there were not probable cause that he was eluding, for the officers to think he was eluding, but there were probable cause with respect to obstruction of justice, what difference does that make here? So, I guess Instruction 26 said they had probable cause for eluding. Instruction 27 said they had probable cause for obstruction. But does it make any difference to the outcome of this case? I had thought they were tied to excessive force, but now I understand you're not claiming drawing arms with excessive force. So, if there was not probable cause for eluding, but there was probable cause for obstruction, how does that affect the outcome here? So, first, I don't think it's our position is not that the drawing of the firearms, it was not excessive. It's our position that we didn't pursue a count based off the drawing of the firearms due to the contours. We still maintain that that non-contact under the Belote v. Edwards standard was excessive. Whether it would have survived a qualified immunity analysis is another question. But I think that the excessive use of that firearm factors into eluding, factors into obstruction, because obstruction has the just cause, refusal without just cause baked into that statute via its own language. That starts providing the just cause to not get out of the vehicle. But I think to answer your question directly, Judge Rushing, I still think that the statement in Instruction 26 that there was probable cause for eluding still goes to the jury and it still factors into the jury's decision. Well, they had probable cause from jump that Lieutenant Nazario had eluded them, and that's going to factor into the jury's determinations. But kind of practically nitty-gritty, how does that differ from the probable cause with respect to obstruction? We have to have a reason if we're going to undo a jury verdict and send it back. We have to distinguish between the two of them. And I don't know that I saw this explicated in the briefs, which is why I'm asking. So I think they, I guess they technically go hand in hand, because if you don't have this probable cause for eluding, then all of a sudden you get all of these actions based off of a minor traffic. But you didn't have probable cause to stop him in the first place. You had probable cause to stop him. For a minor traffic. For the minor traffic violation, but then you have the firearms. And everything else is. I thought it was reasonable suspicion for the stop. Reasonable suspicion for the stop is where I will rest. And you conceded that. I did. Yes, Judge. But you say there's no probable cause for the eluding. For the eluding. And that upends the trial. So that's where the analysis we want to go with this time slice by time slice by time slice begins. As a result, you say there needs to be a new trial. Yes, Judge, because there was no probable cause for eluding. That means that the death threats, that you should be afraid to get out of the vehicle, the mutually inconsistent commands, the failure to even attempt to explain why they had pulled him over initially, all of that starts factoring into what a reasonable officer would believe for obstruction. Because obstruction in the statute says anyone without just cause. And you're not going to get out of the vehicle. It all just builds upon itself. If there was no probable cause for the eluding, then we are in a position where the officers had reasonable suspicion only for a minor traffic violation stop. And it just goes awry from there. Suddenly it's a minor traffic violation and he's being kicked and pepper sprayed and threatened. Do you agree that with a minor traffic stop they could order him out of the vehicle? So Pennsylvania v. MIMS does stand for that proposition. But once again... Are you familiar with Omish v. Kincaid from our court? I am not familiar with Omish. It's a recent decision from 2023. But there we said it wasn't clearly established in March 2019 that if someone refused to get out of their vehicle, the officers couldn't pepper spray them. So it was not clearly established by 2019 that you had a right not to be pepper sprayed if you refused to get out of your vehicle in response to a command. So I know these events happened in December 2020. Do you know of anything between March 2019 and December 2020 that clearly established that law? At that granular level of particularity, Judge Rushing, I do not. But I think that one of the things when you look at this case law, what sets this apart, and even if it isn't this granular... I know qualified immunity isn't on all four corners, right? But in none of the cases, not in Geese, not in Cowleshoot, not in Coffey v. Collins, where this court even said that in retrospect there was no probable cause for obstruction, in none of these cases do we have law enforcement behaving like this. In the Collins v. Commonwealth case, it's actually reversed. We've got this officer behaving well, right? Getting out of the vehicle, approaching the citizen, telling them why they've been pulled over. We can agree that there's a difference between violating the Constitution, violating someone's constitutional rights, and bad officer behavior, right? Saying things that are inappropriate, acting in a way that's too gruff. That can happen without crossing the constitutional line, right? So we're trying to find out where is the constitutional line here. The constitutional line is somewhere far away from what the officers have done. But under qualified immunity analysis, they have to know that ahead of time, right? It has to clearly have been established in the law. So then I think at that point in time, Judge Rushing, what I would say is we look back to the grand factors, right? So that first grand factor, when the officers immediately went hands-on, like at that time of the touching, at that time of the EOC spray, what crime did they have? At that point in time, they had no crime. They had a minor traffic violation, which isn't a crime, which is a prepayable offense. You don't even have to show up in the court. So the district courts seem to believe that because they had this PC for probable cause for eluding, that first grand factor favored Lieutenant Nazario, but not strongly. But when this qualified immunity analysis shifts, just looking at this first grand factor, it strongly favors Lieutenant Nazario. There was no crime. But courts have said repeatedly, right, that just because the grand factors exist doesn't mean that it's clearly established how those factors apply in a given situation. It has to be saying that the grand factors point a certain direction is too high a level of generality. You have to get something closer to the facts of your case. And I think that if I'm not mistaken, in Smith v. Ray, for example, this court has said that even if we don't have anything on all fours, if these first three grand factors strongly favor an appellant or a plaintiff down below, then the officers, and especially these first three, these officers are just not entitled to qualified immunity. It doesn't matter if they use a baseball bat or a taser or if it's smacking a girl that you grab. Because you can reason by analogy. If X is prohibited, then Y must be also. But even that is a much lower level of generality or closer to the facts of the case than just saying, well, the grand factors exist. I don't want to belabor the point, but you understand what I'm saying. Armstrong comes very close to it, and I think that was a taser case. You know, I think that if the officers, under the qualified immunity analysis, if the officers would have sat down and read these cases, they would have thought, well, you know, this says I can't taser them. I probably can't O.C. spray them when it's a frightened human being that I've just told is fixing to ride the lightning, told they should be afraid to get out of the car, and now they're not getting out of the car. So I don't think I would argue to this court that we don't need that granular level of particularity. These are your core constitutional principles at play here. Just because the O.C. itself under these circumstances hadn't been clearly established, I don't necessarily think that it is 100% necessary for the particular mode of violence to have been previously litigated. I think a reasonable officer reading this court's precedent would have understood that because there was this minor traffic infraction, after I told this person that they were fixing to ride the lightning and that they should be afraid to get out of the vehicle. What was the other statement they told him other than fixing to ride the lightning? There was you're fixing to ride the lightning, and then when Lieutenant Nazario, when I believe it was Joe Gutierrez, Officer Gutierrez said get out of the vehicle, Lieutenant Nazario said something along the lines of, you know, I'm afraid to, and Joseph Gutierrez said, yeah, you should be. You should be afraid. You should be afraid. That was within seconds of saying he was fixing to ride the lightning. Yes, Judge Thacker, that's in my mind, a few seconds. So under these circumstances, I don't. You say both of those are basically death threats in the light most favorable to him. In the light most favorable to him, to ride the lightning is a death threat, and the you should be is if you get out of this car, we're going to make good at it. In the light most favorable to Lieutenant Nazario. We have to look at it for some re-judgment. Yes, Judge. And what's the relevance of the, at the end of this whole thing, the officers, the police officers, try to make a deal with him. Yes, Judge. You forget about all this, and we'll forget about all this. Yes, Judge. And everybody got their own way. What's the relevance of that to the kind of claims you got? So we had a First Amendment claim, because that is. I know you got all those claims, but what's the relevance of it? What's it prove? Is it a guilty mind? I think that shows some subjective understanding that what we have done has gone way beyond the pale. Why else would an officer say, hey, you know, if you don't tell anybody, we're not going to press charges, and then go and gin up a whole false police report about assault on a law enforcement officer that everyone has now admitted either didn't occur, according to Officer Gutierrez, or that the videos, all three of them, do not show. And to the extent that the officer's subjective states of mind is relevant in this discussion, I think that demonstrates knowledge of. And I think, actually, that would go to whether a reasonable officer would have understood that the force they used was excessive. These two officers most definitely did, given the horse trading. So, you know, once again, I think that these are the grand factors strongly favor 1, 2, and 3, Lieutenant Nazario. So even if the right not to get pepper sprayed wasn't clearly established, the right not to use this type of force was by 2020. I think we understand your position, sir. Thank you, Judge. Does the Court have any further questions? We appreciate your submissions, both written and oral, and we'll take the matter under advisement. We'll come down and re-counsel and then take a short break. This honorable Court will take a brief recess.
judges: Robert B. King, Stephanie D. Thacker, Allison J. Rushing